ASHER *v*. LINN.

ON REHEARING.

LANDLORD AND TENANT—CONSTRUCTION OF LEASE—FARMS—INTEREST IN LIVESTOCK—EQUALLY DIVIDED COURT.

In tenant's suit for construction of a five-year farm lease, drawn by a layman, and for an accounting thereunder, finding of trial court that lease did not convey to tenant ownership of a one-half interest in the livestock as he claimed is affirmed by an equally divided court.

Appeal from Ingham; Carr (Leland W.), J. Submitted March 31, 1941. (Docket No. 128, Calendar No. 41,441.) Decided June 2, 1941. Submitted on rehearing November 3, 1941. Decided January 5, 1942.

Bill by William Asher against Norman Linn for construction of a written lease and an accounting. Cross bill for reformation and an accounting. Decree for defendant. Plaintiff appeals. Decree entered in lower court was first reversed but on rehearing was affirmed by equally divided court.

*Pierce, Planck & Ramsey,* for plaintiff.

*Foster & Cameron,* for defendant.

McALLISTER, J. Plaintiff filed his bill of complaint for construction of a written lease and an accounting. Defendant, in his answer and cross bill, asked reformation of the lease and an accounting.

Defendant is the owner of a farm in Wheatfield

township, Ingham county; and on February 25, 1937, entered into a written agreement with plaintiff for a five-year lease of the premises. Among other stipulations, the contract of lease provided that defendant lease to plaintiff:

"The following described premises, situated and being in the township of Wheatfield, county of Ingham and State of Michigan, to-wit:

"The southeast ¼ of section number 3 and the north ½ of the northeast ¼ of section number 10 Wheatfield township, Ingham county, Mich.

"Party of the second part is to pay $500 for the use of all of the equipment of said farm which includes the horses, tools, and the one half of all the livestock, cattle, sheep, hogs, chickens excepted party of the second part is to pay *50 per cent.* of all of his part of the proceeds of said farm at the time of the sale thereof with milk check exempted.

"for the term of five years from and after the 1st day of March, 1937, on the terms and conditions hereinafter mentioned, to be occupied for farm purposes.

"Provided, That in case any rent shall be due and unpaid, or if default shall be made in any of the covenants herein contained, then it shall be lawful for the said party of the first part, his certain attorney, heirs, representatives and assigns, to re-enter into, repossess the said premises, and the said party of the second part, and each and every other occupant, to remove and put out.

"And the said party of the second part do hereby hire the said premises for the term of five years as above-mentioned, and do covenant and promise to pay to the said party of the first part, his representatives and assigns, for rent of said premises for said term the sum of Crop rent.

"Party of the second part is to furnish all the terms and tools and is to do all the work, and is to have one half of all crops sown or planted. Each party is to furnish one half of all seed sown or

planted, each party is to pay all the expense of all threshing bills, which includes grass seed.

"Cattle: Each party is to have an equal interest in all cattle and each party is to have equal shares in all of the proceeds and increase from the above-named cattle.

"Hogs: Each party is to have equal shares in all the hogs and is to have equal shares in all the increase and also proceeds from the hogs.

"Sheep: Each party is to have equal shares in all of the sheep and each party is to have equal shares of all of the increase and wool. Each party is to pay one half of the shearing of the sheep.

"Poultry: Each party is to have equal shares in all poultry and is to have equal shares in all the increase and proceeds from the same."

It is contended by plaintiff that by virtue of the lease he became entitled to the use of all of the equipment, tools, and horses on the farm and the owner of a one-half interest in all of the livestock owned by defendant, which were on the leased premises at the time the contract was made. The trial court reformed the contract "by eliminating therefrom the provision tending to indicate that plaintiff was entitled to a one-half interest in the cattle, sheep, and hogs on the farm on the 1st of March, 1937." Plaintiff appeals, claiming the right to such an interest and contending that the contract should be construed to such effect. This is the only question before us on review.

It appears from the evidence that defendant advertised in a newspaper that he had the farm for rent, and that plaintiff went out to the premises and discussed the matter with defendant. He testified that he found the livestock in poor condition and that there was no hay or grain on the premises. Plaintiff further states that at the time he had a good job at a Lansing dairy. Defendant at first

wanted to sell the tools and horses to plaintiff, according to plaintiff's account, and lease the farm. But after looking the place over, plaintiff and his wife decided not to take the farm and he thereafter wrote a letter to defendant informing him of his decision. Sometime afterward defendant came to see plaintiff. The interview is described in plaintiff's testimony:

"*Q.* What was the next step in the negotiations?

"*A.* Well, Linn came down there to my place and he said what is the reason that you were throwing it up. Well I said I have not got the finances to finance it, and I says it is a big undertaking and the stuff is in poor shape and I would have to have a good lay if I undertook it.

"*Q.* All right. What else?

"*A.* Well he said, I will, if you will take the stuff and build it up, he said, *I am sick of it, I cannot maintain them, I have other business to look after, if you take it over I will give you a half interest in the cows and sheep.* He said, if you will take it and take them all off of my hands he said I cannot handle them he said I am—I have other business and he said if it is money that is holding you back he said I will finance it.

"*Q.* And the fact is that he did finance it, did he not?

"*A.* Yes.

"*Q.* Up until January, 1939?

"*A.* Yes, he did.

"*Q.* What did he tell you with respect to financing it?

"*A.* He said I will put a two-hundred-dollar checking account in the bank as soon as you move there and he said 'money is no object.' And when I went there there was no hay there and no grain. I could see that and I could see that there was a lot of money to be spent right on the start, so I explained to Mr. Linn what I had, that was all set, I

did not tell him I had money because I did not have it.

"*Q.* Now what discussion did you have regarding the half interest in the livestock, exclusive of the horses? Where did you first discuss it? Was it when he came down to see you after your letter to him?

"*A.* No, we discussed that the second time I was there, the second time I was out there at the farm.

"*Q.* Who brought up that matter first, you or Mr. Linn?

"*A.* Mr. Linn brought it up. I told him he would have to give me a good proposition because I had a good job there and they were in poor condition and it is a lot of work and a lot more to put a herd up in shape and I could see what I was up against because it would take a lot of hard work and feed, that was what they needed more, and so Mr. Linn understood."

It would further appear from the evidence that the livestock was in a poor condition. Plaintiff testified:

"*Q.* Now will you state briefly what the condition of the herd was and the other livestock that was there. Were there any dead animals there when you went there?

"*A.* Yes, there was 5 or 6 dead calves laid out there and 7 or 8, or 8 or 10 sheep that were dead.

"*Q.* Did others die after you first went there?

"*A.* Yes.

"*Q.* How many did you lose dead?

"*A.* I think there was around 6 or 7, some died that spring.

"*Q.* Calves or sheep?

"*A.* Sheep. They were diseased and running out, it was a diseased and run out flock.

"*Q.* They had not been keeping it up—you are speaking of the sheep?

"*A.* Yes. They never saved the lambs, they sold the lambs off and kept the same flock, the same buck."

Ezra Nealey, a brother-in-law of plaintiff, testified, without contradiction, to the following:

"The barnyard looks better and clearer [cleaner?] I think. When Asher went there they were pretty dirty. Some of the barns had not been cleaned out very recently for one thing, that is, the box stalls I mean. I helped clean them out. I presume out of the two stalls I hauled somewhere between 20 and 25 loads of manure, I could not tell exactly.

"The last I was in the barn and the barnyards they were pretty good, about three weeks ago.

"The stock looks a good deal better than it did when we went there. When we went there the horses were not in any too good condition. They had not had care and were quite thin. I had something to do with the care of the horses. It took us quite a little while to get the horses clean, probably two or three weeks before we got some of the dirt off from some of them and it was not all off them until they shed."

Other witnesses testified that the stock was in poor condition when plaintiff went to the farm and since then there had been considerable improvement, especially in the cattle and care and condition of the premises.

The trial court held that the language of the contract was ambiguous and contradictory; that there was no understanding between the parties that plaintiff would receive a one-half interest in the livestock on the farm at the time he entered upon the premises; that there was no adequate consideration for such an agreement with reference to the livestock, this last consideration, as the court indicated, having a bearing upon the probability of such

an arrangement. A certain importance was attached also to the fact that the contract was drafted by a scrivener, who, as the court observed, "prepared the agreement to accord with the intention of the parties as he understood them;" and the scrivener testified that he understood that plaintiff was to have a one-half interest *in the increase* of the stock. But the important fact in the scrivener's testimony is that he recalled no conversation with regard to this point. In reference to the making of the lease, he testified that he put a blank form into the typewriter. He stated:

*"I drew it as they directed it precisely,* that they had already talked over before they came to the office and I drew it *just exactly as they told me.*

"*Q.* How did you actually draw it—did you put the blank in your typewriter?

"*A.* Yes.

"*Q.* And started off and they would tell you from time to time what to put down?

"*A.* I took one paragraph and another, yes, sir.

"*Q.* Had you talked it over fully, their entire agreement, before you started to type out the lease?

"*A.* They talked it over, I did not have anything to do with that at all.

"*Q.* So you started typing the lease with one or both of them telling you from time to time what to put in?

"*A.* Yes. * * *

"It was by their instruction and it was nothing that I hatched up at all."

If the scrivener only typed what the parties told him, his understanding of what they intended, especially in view of the fact that they did not discuss the matter before him or with him—other than to direct him what to write—would be incompetent and irrelevant.

Another small incident in the dealings of the parties, while not in itself conclusive, can be said to be indicative of defendant's understanding of the contract. A short time after plaintiff took possession of the premises, a calf, which was on the farm at the time of the execution of the lease, died. Defendant sold the carcass to a soap company and gave plaintiff credit for one half of the proceeds, which amounted to $1.25. Defendant's explanation for this action was that it did not amount to much. But there had been a conversation between the parties with regard to these proceeds and it was agreed that instead of receiving one half of the money, plaintiff would receive credit. This transaction indicates a prior understanding that plaintiff had a one-half interest in the livestock on the farm when he took it over.

We are of the opinion that the provisions of the contract that each party was "to have an equal interest in all cattle *and* that each party is to have equal shares in all of the proceeds *and increase* from the above-named cattle," together with similar provisions with reference to the sheep and hogs, entitled plaintiff to a decree awarding him a one-half interest in all such livestock on the farm at the time of the lease. This conclusion is strongly fortified by the fact that, after plaintiff had refused to take the farm, defendant came to see him and told him, "If you take it over I will give you a half interest in the cows and sheep." This evidence is uncontradicted, and our construction of the contract, as above indicated, hardly does more than carry out what must have been defendant's understanding and agreement, by which he, presumably, induced plaintiff to take over the farm.

It is true that in another part of the lease some confusion might appear in the provision that plain-

tiff was to pay "$500 for the *use* of all of the equipment of said farm which includes the horses, tools, and the one half of all the livestock, cattle, sheep, hogs."

The use of the one half of the livestock could mean the use of defendant's share for purposes of breeding and the production of milk and wool. Whatever obscurity may arise from this language and the testimony in regard thereto, it does not militate against the provisions of the contract above referred to, and our conclusions regarding them.

The claim that defendant did not understand the contract and did not read it is without significance. He executed it and was given a copy at the time of execution of the lease. Whether defendant made a good contract or a poor one is irrelevant, as is also any discussion of the matter of consideration.

The decree of the trial court is vacated and the cause remanded to the circuit court for an accounting and a decree in conformity to this opinion. Plaintiff will recover costs.

SHARPE, C. J., and BUSHNELL, CHANDLER, and BUTZEL, JJ., concurred with McALLISTER, J.

WIEST, J. (*dissenting*). I am in accord with the opinion of the circuit judge.

The claim of plaintiff that the lease, at its inception, vested in him ownership of one half of the livestock then on the farm and of the value of about $1,500, and owned by the lessor, instead of an equal interest therein to the extent of sharing in the proceeds and increase therefrom, is not sustained by the evidence in the case. The language of the lease on the subject is ambiguous but, when considered in the light of the circumstances of the parties, merely grants the lessee an interest in the livestock

for the purpose of sharing in the increase and not a vested ownership as claimed by plaintiff.

The circuit judge stated in an opinion:

"Neither party claims, however, there was any understanding that plaintiff should pay for half of the livestock in the manner indicated. As before stated, it is plaintiff's position that he is entitled to receive one-half interest therein without making any specific payment therefor, other than the carrying out of the lease. Obviously such interpretation, as well as the interpretation suggested by the language used by the scrivener, would lead to the conclusion that the determination of the question as to whether title to the stock actually passed would necessarily have to be held in abeyance pending the completion of the five-year contract, otherwise a failure of consideration might result. Viewing the situation in the light of the probabilities, and having due regard for the value of the property, as well as the situation of the respective parties, I am brought to the conclusion that defendant's contention is correct. In any event, I am impressed that there was no understanding or agreement on his part to the effect that plaintiff should receive a one-half interest in the stock then on the farm. If plaintiff thought otherwise, then we have a situation in which the minds of the parties did not meet on an important part of their undertaking. A conclusion of this nature finds support in the record. However, neither party is seeking a cancellation of the contract on the ground of mistake, but rather a carrying out of the agreement as properly construed.

"In weighing the respective claims of the parties as to what was actually agreed to be done the element of consideration may well be considered. Having in mind the value of the livestock at the time the contract was made, and taking into account the manner of operation under the lease, the conclusion is unavoidable that there was no adequate consideration to support any such undertaking as plaintiff

claims was made with reference to the livestock. This, of course, bears on the probability of such an arrangement. Without going into this phase of the controversy further, it is my conclusion that the contract should be reformed by eliminating therefrom the provision tending to indicate that plaintiff was entitled to a one-half interest in the cattle, sheep, and hogs on the farm on the 1st of March, 1937."

The decree should be affirmed, with costs to defendant.

BOYLES and NORTH, JJ., concurred with WIEST, J.

## ON REHEARING.

WIEST, J. This opinion is on rehearing, granted in *Asher* v. *Linn*, 297 Mich. 699. The court authorized a supplemental record of testimony at the hearing in the circuit court. The point in issue is whether, as claimed by plaintiff, in leasing defendant's farm on shares he was given ownership of one-half interest in the livestock, except horses and chickens, on the farm at the date of the lease. The lease was drawn by a layman and provided:

"Party of the second part (plaintiff) is to pay $500 for the use of all of the equipment of said farm which includes the horses, tools, and the one half of all the livestock, cattle, sheep, hogs, chickens excepted. * * *

"Cattle: Each party is to have an equal interest in all cattle and each party is to have equal shares in all of the proceeds and increase from the above-named cattle.

"Hogs: Each party is to have equal shares in all the hogs and is to have equal shares in all the increase and also proceeds from the hogs.

"Sheep: Each party is to have equal shares in all of the sheep and each party is to have equal shares

of all of the increase and wool. Each party is to pay one half of the shearing of the sheep.

"Poultry: Each party is to have equal shares in all poultry and is to have equal shares in all the increase and proceeds from the same.

"All stock is to be fed out of the undivided hay and grain."

The supplemental record shows that at the hearing in the circuit court plaintiff testified there was on the farm when he went there:

"Twenty cows, 5 heifers, 7 calves, just weaned, 3 calves fed by pail, 2 yearling bulls, 2 sows, 4 little pigs, 62 sheep, 6 work horses, 1 sucking colt. That includes the livestock. 600 bushels of oats, grain, 100 bushels of wheat, 50 bushels of barley. No corn in the crib. No hay, no ensilage, no clover-seed, very little straw."

Plaintiff testified:

"I paid $500 for the use of the tools for five years and any time during that five years if I bought in I would pay $500 a year on the tools and horses, they would be inventoried and no time set. * * *

"Q. It was $500 according to your understanding of the lease, did that have anything to do with the livestock, cattle, sheep, hogs and so forth?

"A. No, sir.

"Q. It refers to one half of the livestock, cattle, sheep, hogs, doesn't it?

"A. Well, it should not be—

"Q. Do you mean by that that Mr. Liverance did not draw it up the way it was talked over between you and Mr. Linn in that respect?

"A. That was not the agreement.

Mr. Liverance testified that the parties were present when he drew the lease:

"Q. Was there any talking between them that you recall or were you told by either of them that Mr. Linn was conveying or giving to Mr. Asher in

the lease a half interest in all of his livestock that was then on the farm, sheep, hogs, and so forth?

"*A.* No.

"*Q.* I understand you just stated that you were not instructed by either of them to provide for the conveyance of half the cattle, hogs, sheep on the farm from Mr. Linn to Mr. Asher and I take it it was not your intention to draw up those paragraphs that are referred to, to convey half the sheep, cattle, hogs and so forth then on the farm to Mr. Asher?

"*A.* Why I understood he was leasing the farm and each one was to have a half interest in all the proceeds of the increase. That is the way I understood it.

"*Q.* Why did you use the phraseology you did, then, 'Each party,' for instance under 'cattle,' is to have an equal share in all cattle?

"*A.* Well that is the usual way of drawing a farm lease.

"*Q.* And what did you mean to accomplish by using—what did you intend to express by using those words, 'each party is to have an equal interest in all cattle'?

"*A.* Well I don't know as I know any more than I supposed that the proceeds of the cattle, hogs and sheep was to be divided equally between the two parties.

"*Q.* Do you recall any discussion or conversation at that time between Linn and Asher in regard to that point?

"*A.* I don't remember of anything like that talked about.

"*Q.* You understood then that Mr. Asher was to share the proceeds from half of the cattle and hogs and sheep?

"*A.* Yes."

The circuit judge took an account between the parties, construed the lease, and found:

"Neither party claims, however, there was any understanding that plaintiff should pay for half of

the livestock in the manner indicated. As before stated, it is plaintiff's position that he is entitled to receive one-half interest therein without making any specific payment therefor, other than the carrying out of the lease. Obviously such interpretation, as well as the interpretation suggested by the language used by the scrivener, would lead to the conclusion that the determination of the question as to whether title to the stock actually passed would necessarily have to be held in abeyance pending the completion of the five-year contract, otherwise a failure of consideration might result. Viewing the situation in the light of the probabilities, and having due regard for the value of the property, as well as the situation of the respective parties, I am brought to the conclusion that defendant's contention is correct. In any event, I am impressed that there was no understanding or agreement on his part to the effect that plaintiff should receive a one-half interest in the stock then on the farm.''

It is manifest from plaintiff's testimony that the $500 mentioned in the lease was not to be in payment for one half of the livestock, and the court was right in so finding.

The decree is affirmed, with costs to defendant.

Boyles, North, and Bushnell, JJ., concurred with Wiest, J.

Butzel, J. Re-examination of the record and all the briefs has not changed my view that the majority opinion written by Mr. Justice McAllister and published in 297 Mich. 699 is correct. The main record indicates that either at the time that negotiations were pending or when plaintiff first took possession, there were 600 bushels of oats, 100 bushels of wheat, 50 bushels of barley on the farm. There was no corn, no hay, no ensilage, no clover seed and very little straw. This amount of grain was

comparatively small as compared with what was on hand at the time of the trial, when there were 4,950 bushels of wheat, rye, barley and corn, some 35 tons of hay and a large amount of ensilage, straw and seed. Plaintiff's successful operation of the farm indicates that defendant sought a farmer of real ability and that plaintiff, on the other hand, might have been influenced by a worth-while consideration to undertake the restoration to a healthy condition of the rundown livestock, for the fattening of which he was to contribute one half of the feed. It would be natural for him to demand some substantial interest in addition to the natural increase from the cattle. He testified that the agreement expressed the prior verbal arrangements; the scrivener testified that he wrote down what he was told by the parties. Defendant's crediting to plaintiff's account one half of the proceeds from the sale of a carcass of a calf shortly after the lease was entered into and the silence of defendant for almost two years as to his claim that the lease did not express the real agreement of the parties, all tend to uphold plaintiff's claim. The evidence is neither clear nor convincing that a mistake was made. It indicates the contrary. In *Goldberg* v. *Cities Service Oil Co.*, 275 Mich. 199, 211, we reiterated the correct rule as set forth in *Vary* v. *Shea*, 36 Mich. 388, 398, that

"The evidence of mistake in a written contract, on which the court should act in giving relief, ought to be so clear as to establish the fact beyond cavil."

I do not believe that the opinion heretofore adopted by a majority of the court should be disturbed.

The decree for plaintiff provided therein should be entered, with costs to plaintiff.

Chandler, C. J., and Starr and Sharpe, JJ., concurred with Butzel, J.